UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
BARBARA DELO,                                          :
                                                       :
                                  Plaintiff,           :        Civil Action No.
                                                       :
                v.                                     :
                                                       :        **COMPLAINT**
PAUL TAYLOR DANCE FOUNDATION, INC.                     :
d/b/a PAUL TAYLOR DANCE COMPANY and                    :
JOHN TOMLINSON, in his individual and                  :        **Jury Trial Demanded**
professional capacities,                               :
                                                       :
                                  Defendants.          :
------------------------------------------------------------ X

Plaintiff Barbara Delo ("Plaintiff" or "Ms. Delo") by and through her attorneys, Wigdor

LLP, as and for her Complaint against Defendants Paul Taylor Dance Foundation, Inc. d/b/a Paul

Taylor Dance Company ("Paul Taylor," "PTDC" or the "Company") and John Tomlinson

(collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      Paul Taylor Dance Company and its Executive Director John Tomlinson have for

years treated their female dancers and backstage employees with blatant contempt and

discrimination, piling indignity and fear onto women in an industry already known to be a harsh

one for them.  This Complaint will document some of the longstanding practices at PTDC under

which female employees, particularly pregnant employees, have suffered for many years.

Indeed, even the Company's founder, Paul Taylor, was himself known to pressure his dancers

not to marry or have children, with the idea being that they would somehow remain cosmically

married or tied to him as his "muses."

2.      John Tomlinson, who participated in and added to Mr. Taylor's mistreatment of

the Company's female dancers, has focused much of his hostility on and open animus against

pregnant employees and parents at the Paul Taylor Dance Company.  During her year working at the Paul Taylor Dance Company from 2021 to 2022 designing, preparing and maintaining costumes for the Company's dancers, Plaintiff Barbara Delo, a costumer and mother with a newborn, faced undisguised discrimination, harassment, and retaliation by the Company's management.  Executive Director Tomlinson denied Ms. Delo a private place to express breast milk for her newborn, as required by federal and New York law.  Tomlinson apparently was so incensed by Ms. Delo's pregnancy and need to express milk at work that in December 2021 he physically intimidated her by bringing repairmen into her office and then remaining there with them at a time when he could see that she was in the middle of pumping milk.  Even worse, rather than leave as quickly as possible, he deliberately and aggressively reached over her body to make an unnecessary phone call from the desk phone, which left Ms. Delo humiliated and in shock.  There is no doubt that these acts were meant to intimidate, punish and harass Ms. Delo for her protected status as a new mother who needed space to express milk for her child.  Tomlinson also was clearly furious at Ms. Delo for the legally protected complaints she had made just the day before regarding discrimination and the Company's legal obligations to give employees a private space to express breast milk.

3.    Tomlinson's animus against Ms. Delo started before she even had begun work at PTDC.  In fact, he would not approve her hiring in the first place.  After interviewing Ms. Delo, who was visibly pregnant at the time, Tomlinson asked a colleague, "What will she do with the baby?," before hiring a less-qualified man who soon failed to fulfill the job's requirements.  After this, Tomlinson reluctantly agreed to the hiring of Ms. Delo, who by then had given birth to her child, Olive, although he repeatedly griped about and spoke negatively about her, particularly when he saw Ms. Delo's baby on Paul Taylor's premises.  On one of the few such

occasions that he saw her child, the baby had actually been brought to work by Ms. Delo's husband, who also worked for Paul Taylor, and not Ms. Delo—yet Tomlinson still directed his anger at Ms. Delo, rather than the child's father.

4.  Soon, Tomlinson instituted a bizarre and oppressive "no child on the premises" policy at PTDC, even though he had not done so for years when a male dancer was regularly bringing his child to the studio.  Ms. Delo was not the only person to face discrimination by the Defendants during her employment.  PTDC also has heaped abuse on its lead dancer, Eran Bugge, a celebrated and hardworking artist, with Tomlinson calling her an "embarrassment" when she was performing during the early months of her own pregnancy.  Although Artistic Director Michael Novak, and Rehearsal Directors Cathy McCann and Andy LeBeau were willing to allow the alteration of dance steps to accommodate older male dancers who could not perform certain steps or pieces to full effect, they discriminatorily refused to do so for Ms. Bugge.

5.  As soon as there was a window when it would not disrupt Paul Taylor's performance schedule and season, Tomlinson terminated Ms. Delo at the end of July 2022, which was the culmination of his hostility towards her because she was a mother and had forthrightly reported his discriminatory conduct and the violations of PTDC's legal obligation to provide a space for expressing breast milk.

6.  Defendants' conduct therefore has violated Title VII of the Civil Rights Act of 1964 ("Title VII"), the Fair Labor Standards Act ("FLSA"), the New York Labor Law § 740 *et seq.* ("NYLL"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL").

## ADMINISTRATIVE PROCEDURES

7.      Plaintiff will file a Charge of Discrimination with the Equal Employment Opportunity Commission, an administrative pre-requisite to filing an action under Title VII and will amend this action to include claims under Title VII at the appropriate time.

8.      Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within 10 days of its filing, thereby satisfying the notice requirements of this action.

9.      Plaintiff has complied with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FLSA.  The Court has supplemental jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including most of the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

12.     Plaintiff Barbara Delo was a Costumer at Paul Taylor and a resident of the State of New York.  At all relevant times, Ms. Delo met the definition of an "employee" under all applicable statutes.

13.     Defendant Paul Taylor Dance Company is a 501(c)(3) tax-exempt organization based in New York, New York at Top Floor, 551 Grand Street, New York, NY 10002.  At all relevant times, Paul Taylor was Ms. Delo's "employer" under all applicable statutes.

14.     Defendant John Tomlinson is, upon information and belief, a resident of the State of New York and at all relevant times was the Executive Director at Paul Taylor and had the authority and ability to control and alter the terms and conditions of Ms. Delo's employment. Mr. Tomlinson was Ms. Delo's "employer" and/or an agent of Paul Taylor under all applicable statutes and laws.

## FACTUAL ALLEGATIONS

**I.     THE REGRETTABLE HISTORY OF DISCRIMINATION AND ABUSE OF WOMEN IN NEW YORK CITY DANCE AND THEATRE**

15.     Barbara Delo is a Costumer with a BA in Technical Theatre and an MFA in Costume Design from NYU Tisch Design.  She has worked as a Costumer for at least thirteen years, with experience spanning opera, regional, off-Broadway, Broadway theatre, and modern dance.

16.     During this period, she mastered the research and design of costumes, their maintenance and technical construction, and the management and budgeting of costume shops and departments.

17.     She is also specialized in the dance field as few similarly situated professionals are, having worked for productions with large, rotating casts of dancers in the Julliard costume shop, and having worked as a Wardrobe Supervisor at Martha Graham for three years.

18.     PTDC repeatedly discounted Ms. Delo's strong credentials and instead made decisions based on unlawful animus against her gender and caregiver status, as well as retaliation for her protected complaints.  PTDC's conduct and treatment of Ms. Delo and others shows that

it believed its artistic pedigree and prerogative placed it above antidiscrimination laws and put it outside the realm of accountability.  For example, as further described below, when Production Manager Stacey-Jo Marine reported to the Company in 2022 that Richard Chen See had accosted and screamed at her, and that one of PTDC's donors, Hal Rubenstein, had called the dancers "fuckable" to their faces, PTDC's Executive Director John Tomlinson responded to her that Chen See is "an artist" who is entitled to have violent outbursts against women who annoy him.

19.     No doubt PTDC considers the extreme sexual harassment of its dancers merely a part of the artistic industry and something that dancers must put up with from the powerful and rich men who fuel fundraising and often run these organizations.

20.     An artistic mission is not a defense under the antidiscrimination laws (or, truly, any law).  The theatre and performing arts industry must learn, as Hollywood is beginning to learn, that they are not above the antidiscrimination laws merely because their work involves artistic expression.  This reckoning has arrived in full force for other dance companies, some with a higher profile than PTDC.  The New York City Ballet recently has had to reckon with sexual harassment and publication of revenge porn by some of its main dancers, as well as other high-profile scandals, covered by numerous media outlets, regarding the resignation of Peter Martins after he was alleged to have strangled a female dancer, Kelly Boals.

21.     The Defendants' discrimination against Ms. Delo, as well as lead dancer Eran Bugge, Production Manager Stacey-Jo Marine, and Laura Halzack, unfortunately is all part of a larger picture of harassment with impunity and disdain for working mothers at Paul Taylor. These experiences have demoralized and humiliated Ms. Delo.

22.     On its website, PTDC purports to embrace "commitments to develop and sustain a culture of equity, fairness, and belonging across all facets of our work and our organization,"

while also apparently admitting that the "[f]oundation grew from and exists within a world with a strong current of discrimination and exclusionism." Its actions to date show that any promise of "equity" or "fairness" by PTDC are empty.

## II. PTDC DISCRIMINATES AGAINST MS. DELO BEFORE EVEN HIRNG HER, IMMEDIATELY BEGINNING A PATTERN OF EXTREME GENDER, PREGNANCY AND CAREGIVER DISCRIMINATION

23.     PTDC's discriminatory animus and motivations were revealed, and the Company's discrimination against Ms. Delo began, before the Company had even hired her.

24.     In June 2021, she interviewed for a position as a full-time Wardrobe Supervisor during the fourth term of her pregnancy, while she was visibly pregnant. Two other candidates, both men, also interviewed for the role. Tomlinson and Marine interviewed all three candidates, including Ms. Delo. They decided that PTDC should hire one of the two male candidates, but that male candidate declined the offer.

25.     To Marine and others at PTDC, Ms. Delo was far more qualified than the other remaining male candidate, and everyone Marine consulted agreed that Ms. Delo should be hired over the remaining man, given her education, deep experience, and dance specialization.

26.     But Tomlinson had one concern overriding any consideration of the actual work Ms. Delo would be doing, or for that matter PTDC's artistic production. When Marine recommended hiring Ms. Delo, Tomlinson asked, "What will she do with the baby?" Tomlinson therefore unambiguously conveyed his belief that a woman could not fully commit to a job if she had a young child. Marine responded that it was neither Tomlinson's business nor his problem how Ms. Delo would handle her childcare.

27.     Tomlinson obviously incorrectly and stereotypically believed a mother could not perform the work, and given Ms. Delo's experience in theatre, this belief was obviously

inappropriate and false.  After thirteen years, Ms. Delo well understood how tours and performances at any theatre or dance company run.  She would not have been interviewing for a job at PTDC if she had not made arrangements in order to avoid missing any meaningful amount of the Company's upcoming season, and she had plans in place to hire a nanny, share caretaking responsibilities with her husband, and pump milk at work as needed.

28.     Nevertheless, though hiring Ms. Delo was acknowledged to be the best option for PTDC's business and its artistic expression on the merits, Tomlinson chose instead to hire the less-qualified man because of his concern that Ms. Delo could not work while pregnant or having an infant at home.  Soon, the man hired at Tomlinson's insistence (over the recommendations of others to hire Ms. Delo) failed in the job and missed multiple scheduled work sessions.  Only then did PTDC finally hire Ms. Delo in September 2021 as a full-time employee.

29.     Tomlinson's statements are direct evidence of both pregnancy and caregiver discrimination and enough to demonstrate discriminatory animus and support legal claims on their own.  Yet, these blatantly discriminatory statements by Tomlinson are only the tip of the iceberg.

30.     Tomlinson went even further in his discrimination against Ms. Delo, even after she finally was hired by PTDC.  After denying Ms. Delo a job the first time, PTDC hired her husband, Christopher Chambers, in July 2021.  Because of the failure of the male Wardrobe Supervisor who had been hired in Ms. Delo's place, PTDC had to hire Ms. Delo on extremely short notice in September 2021, before she and her husband had a chance to work out a childcare plan that allowed for them both to be working at PTDC.

31.     Ms. Delo quickly proved that having a child was no impediment to her work.  She and Mr. Chambers arranged to have him stay home with the newborn child, Olive, for a few days

while she got oriented at work and they lined up a nanny.  However, PTDC quickly needed Mr.

Chambers to work on an urgent lighting problem, forcing him to come into Paul Taylor's offices

with their baby, Olive, on Ms. Delo's first day of work, because no one was available to watch

her while both parents were working.

32.     When Tomlinson saw that Olive was in the building, he immediately found

Marine to tell her, essentially, "I told you so" about hiring Ms. Delo.  The presence of the baby

on the premises (which caused no problems whatsoever) was somehow proof, to him, that Ms.

Delo's motherhood would disrupt PTDC's operations.

33.     Even though he saw Mr. Chambers with Olive (and not Ms. Delo) firsthand, it

never occurred to Tomlinson that Mr. Chambers was the one who was responsible for the

couple's childcare for that day and had brought Olive to work, even though Tomlinson

understood perfectly well that Mr. Chambers and Ms. Delo were married (having been told by

Marine).  Once again, this outward, unabashed stereotyping and assumption by Tomlinson

showed with terrific clarity his unequal regard for, treatment of, and attitude towards women

versus how he viewed and dealt with men under his authority and supervision.

**III.     PTDC'S DISCRIMINATORY TREATMENT OF LEAD DANCER ERAN BUGGE
        AND ITS LONG PRACTICE OF DISTURBING SEXUAL DISCRIMINATION**

34.     Around the time of Ms. Delo's first interview with PTDC, lead dancer Eran

Bugge also was the target of pregnancy discrimination.  Ms. Bugge became pregnant in 2021 and

began to show in late 2021.  Appallingly, Tomlinson told Marine that Ms. Bugge was an

"embarrassment" in her pregnant state.

35.     As her pregnancy progressed, Ms. Bugge requested minor modifications to her

dance steps, in order to decrease risks to her and her unborn child.  These modifications did not

make any material difference to her performances or the artistry of the Company's dance pieces.

36.     Modifications of one kind or another were common at PTDC (as with all live performance), including for things such as injuries or other limitations or artistic or technical reasons.  Novak might change a dance because of a stubbed toe, or to ensure a dance would fit on a smaller stage.  Indeed, PTDC routinely granted such modifications to male dancers, including but not limited to those who needed them due to their age.

37.     For instance, around this same time, dancer Michael Apuzzo began unilaterally modifying his routines, without asking for approval or giving any notice, because, as he entered his forties, he was no longer able to perform some of the more athletic and vigorous moves to full effect.  No one questioned him.  To the contrary, Tomlinson expressed to Marine repeatedly that PTDC owed it to Apuzzo to "support him where he is at," and expressed no concern about Apuzzo's unilateral modifications.

38.     The reaction to Ms. Bugge was quite different when she requested even the slightest modifications to her routines.  McCann, LeBeau and Novak made it clear that any such modification for her was out of the question.  Although PTDC may have refused modifications uniformly (though this is not realistic, as changes are frequently necessary), in reality PTDC discriminated between women and men, allowing men to modify dance routines at will, while telling Ms. Bugge that she could not make even *de minimis* changes to protect her own health and that of her unborn child.

39.     In doing so, PTDC violated Ms. Bugge's rights under federal, state, and local laws against gender and pregnancy discrimination.  PTDC may respond that nobody knew Apuzzo was changing the dances, but not only is that implausible at an organization like PTDC (and his changes did not in fact escape the notice of Tomlinson and others), but would be an incongruous display of artistic and directorial indifference.

40.     Tomlinson and PTDC's discrimination against Ms. Delo and Ms. Bugge are only some of the latest episodes in a long history of similar misconduct at the Company.  The Company's founder and namesake Paul Taylor himself personally fostered a hostile, discriminatory environment when he was still PTDC's Artistic Director and Choreographer.

41.     It was well known that Paul Taylor hated when his female dancers got married or became pregnant.  He publicly expressed that he thought of them all as his personal "muses" to whom he was cosmically married, and felt that his dancers should stay loyal to him and his art by not marrying or having children.

42.     For instance, on one occasion, back when Laura Halzack[1] was still a dancer at the Company, Tomlinson told her to go to Paul Taylor and promise him she would never have a child.  After Halzack made this humiliating pledge to Mr. Taylor, she dutifully reported back to Tomlinson that she had done it, and Tomlinson laughed in her face, taking delight in his power over her.

43.     It is Ms. Delo's understanding that the history of PTDC is rife with similar incidents—and that the vast majority of women to dance with the Company have experienced or observed similar humiliation and mistreatment.  Ms. Bugge, for example, has reported that she knows of numerous alumni who have given similar accounts.

---

[1]     Ms. Halzack had joined PTDC as Head of Social Media by the time of the events described here.  Dance companies commonly hire former dancers to fill administrative roles, as was the case with Mr. Chen See as well.

## IV.   TOMLINSON HAS AN ANGRY OUTBURST TOWARDS MS. DELO BECAUSE SHE HAS A CHILD, AND MS. DELO MAKES PROTECTED COMPLAINTS REGARDING GENDER DISCRIMINATION AND VIOLATIONS OF THE FLSA AND NEW YORK LABOR LAW

44.     When she joined PTDC in September 2021, Ms. Delo had only a week to prepare costumes for PTDC's Kennedy Center Tour in Washington D.C., which was one of the Company's major events that season.  She needed to have Olive in the hotel during the trip to Washington D.C. so that she could care for her properly.

45.     This caused no material disruption at all to PTDC or her duties.  Ms. Delo and Mr. Chambers hired a local nanny in Washington D.C. to care for Olive in the hotel room while Ms. Delo worked.  Nevertheless, Tomlinson still expressed his disgust to Ms. Delo regarding her status as a mother with childcare responsibilities repeatedly, for example by refusing to speak with her when he saw her around the hotel after hours with her child.

46.     Knowing that Ms. Delo was staying at the hotel with her child, Tomlinson told Marine that he believed Ms. Delo was "a liability."  Of course, he had no reason to say so apart from his previously declared reservations about having a mother on staff at PTDC.  Olive's presence posed no conceivable risk or liability to PTDC, any of its employees, or its operations. The only real reason Tomlinson had for calling Ms. Delo and Olive a "liability" was that he harbored unjustified animus against Ms. Delo as a working mother.

47.     Despite Tomlinson's visible disdain for her, Ms. Delo continued to perform well, validating Marine's faith in her.  After the Kennedy Center tour and another tour in Greenwich, Connecticut, the Company turned its attention to the upcoming Reunion performances spanning October and November 2021.

48.     These were small, gala-style performances for groups of donors, who would choose the pieces to be performed. These performances and a few other projects lasted until

around the Thanksgiving and Hanukkah holidays, during which the entire team enjoyed hard-earned time off.

49.     In early December 2021, the dancers and production team returned to the studio for rehearsals.  PTDC's offices and facilities occupy the second floor of a building in Manhattan that has a studio for the dancers, where some performances are held, and offices for the administrators and production team.

50.     There is a shared office for all of the administrators such as Chen See and Halzack, a separate shared office for the production team (at the time, Marine, Delo and Chambers), and private offices for Michael Novak and John Tomlinson.  There were also two other private spaces that were used flexibly by PTDC.

51.     At the studio, and when she worked from PTDC's main office, Ms. Delo often exercised her right under the New York Labor Law and FLSA to pump breast milk.  However, she had no choice but to do so at her desk in the shared production office.  This itself was a violation of PTDC's legal obligations, because the Company failed to comply with the New York Labor Law and FLSA's requirement that it provide a private space for mothers to express breast milk (unsurprising given management's negative animus towards working mothers).

52.     A private space such as one of the separate offices used by Tomlinson or Novak, or one of the other available private spaces in the PTDC offices, were not made available to Ms. Delo.  As Tomlinson's later actions would demonstrate, the law exists not only to give women privacy and dignity, though that is part of its purpose, but also to give them a safe, clean, and calm space to pump (other than a bathroom), because stress can interrupt the expression of breast milk.

53.     After they returned to the studio, Tomlinson called Ms. Delo, her husband, and Marine to meet in the shared production office.  For her part, Marine believed they had been gathered for a recap of the Reunion performances.

54.     Marine also believed that, despite the visible tension and behavior of Tomlinson, Ms. Delo's employment had been going well, and Tomlinson had no reason to be unhappy with the decision to hire Ms. Delo.  Marine hoped that Tomlinson had moved on from his fixation on Ms. Delo's pregnancy and motherhood.

55.     To the total shock of everyone he had called to that meeting, Tomlinson did not talk about the Reunion performances or even Ms. Delo's job performance, but instead launched into a tirade about Ms. Delo bringing her child with her to Washington, D.C.  He told them that PTDC practiced a "separation of church and state" between family and work life, and that it was completely unacceptable for a child to appear in any PTDC workspace, ever, claiming that it was too distracting and disruptive.

56.     Barely knowing how to handle this ambush, but obviously realizing that it was aimed at her and Olive, Ms. Delo asked whether she had caused any problems.  Tomlinson replied only by saying, "Not yet," meaning that he was assuming for no reason other than his own unlawful bias that her status as a mother (i.e., a female parent) would disrupt PTDC's operations in the future.

57.     Tomlinson also claimed to be on his guard because of an experience with a prior dancer, Ted Thomas.  He claimed that Ted Thomas had, over the five or six years he had been a dancer with PTDC, constantly brought kids backstage and to the studio without a sitter, and let them run wild.  Tomlinson did not appear to realize he was admitting to his bias and presaging, at a minimum, a policy and practice of discrimination.

58.     Tomlinson had admitted to allowing a <u>man</u> to bring children to the premises for years without ever taking any adverse action against him (just as with Ms. Delo's husband), only to turn around and chastise a woman, Ms. Delo, who had merely brought her child to a hotel on a work trip, which was not at all disruptive.  This is undeniable gender discrimination.

59.     As further described below, Tomlinson went so far as to roll out an anti-child policy prohibiting children in the workplace for the entire company in 2022, in clear reaction to Ms. Delo's parenthood.  While he would again attempt to justify the policy based on an experience from years before, the plain fact was that he had never instituted such a policy when it was a man whose child was causing the "problem."

60.     Of course, Ms. Delo saw the injustice and discrimination in this situation.  She therefore made a protected complaint of gender discrimination by asking in this meeting why Tomlinson had never criticized her husband when he came to work with a newborn child.  She said this in order to point out to Tomlinson that he was treating her differently based on her gender.  Tomlinson claimed he "did not know" that Mr. Chambers had a child.  This made absolutely no sense.

61.     Tomlinson knew very well that Ms. Delo and Mr. Chambers were married.  He had interviewed Ms. Delo while she was pregnant, and he had seen Mr. Chambers with their child during a tech studio session, as described above.  Marine, too, could not help but notice the obvious double standard in what Tomlinson was now saying.  Especially paired with what PTDC had just done to Ms. Bugge, it was apparent to her that Tomlinson was engaged in a campaign of discrimination against the female creative employees of PTDC.

62.     Shortly after this painful conversation, Ms. Delo wrote an email to PTDC's HR person, seeking to clarify Tomlinson's declared "church and state" policy regarding children.  In

particular, she asked how this policy would impact her expression of breast milk, because Tomlinson could be hostile towards the practice, given what he had said (and the unmistakable negative message about her motherhood that he had conveyed).

63.    Ms. Delo noted specifically that "John mentioned . . . not forcing anyone to be around anything regarding babies, etc. if they didn't want to be."  Such a statement by Tomlinson, contemporaneously documented in this communication by Ms. Delo, obviously conveys more disdain for the presence of children than any real concern about disruption of the workplace.

64.    The HR person (Sarah Schindler) responded the next day, explaining that, "There is no problem with you expressing milk while working at your computer," and offering to set up a more private space, showing that at least she personally understood the requirements of state and federal labor laws (even if the Company was not willing to comply with them).

65.    Schindler also told Ms. Delo that it was fine "if once in awhile you need to bring your baby."  She added, "I think John's concern was that staff cannot do this on a regular basis and we can't have unsupervised kids running around," and referenced the story about Ted Thomas and his children.  This was not at all, however, what Tomlinson had said.  He had not equivocated or hedged on the strict no-kids prohibition.

66.    In her response to this email from Schindler, Ms. Delo urgently asked that PTDC address the clear discriminatory and unlawful policies and practices, particularly given Tomlinson's expressions of contempt for her status as a mother.  **In particular, she asked that PTDC remedy its lack of a private space for her to express breast milk.**  She also pointed out the completely inappropriate comparison of her situation to that of Ted Thomas, as she had never

"b[r]ought my child inside a theatre with this company, nor have I ever left my 5 month old baby alone unsupervised."

67.     Schindler had tried to deflect and soften the declaration by Tomlinson, and at that point Tomlinson entered the email thread.  He now pretended to follow Schindler's lead in softening the policy, saying that PTDC would "be flexible and understanding if emergencies arose."  This was quite different from saying, as Schindler had, that kids could come to the studio, just "not on a regular basis," and showed yet again that Tomlinson in reality did not want children at PTDC, ever.

68.     Between these two statements, there was no way for Ms. Delo to know what was permitted and what was not (much less what would draw Tomlinson's ire and negative job consequences).  Tomlinson then could not help himself and immediately contradicted himself anyway, by adding that, "The rule is very straightforward—not having children in the workspace."  Of course, whiplashing between three distinct positions (emergencies only/ anytime, just not on a "regular basis"/under no circumstances), after making it clear to all that he harbored animosity towards Ms. Delo because she is a mother with a small child, left Ms. Delo completely in the dark with no usable guidance as to what she could do regarding her child, even in a childcare emergency.

69.     The various statements on the Company's policy regarding children in the workplace make it very clear that Schindler and Tomlinson perceived Ms. Delo's communications as an expression of concerns regarding, and a protected complaint of, gender/family status discrimination which implicated Ms. Delo's legal rights.  This was strongly demonstrated by Tomlinson feeling the need to add to his email that "the rule has been applied equally to men and women when applicable."  Id.

70.     Acknowledging Ms. Delo's complaint of gender discrimination, Tomlinson also claimed that he had similar conversations with parents working at PTDC over the years, in a false attempt to demonstrate that he was not treating Ms. Delo differently because she was a woman with a child rather than a man.  It is doubtful that Tomlinson in fact had such conversations.  Indeed, to the extent that he did have such conversations with men, his pattern of conduct strongly suggests that he was significantly less intimidating and combative with males and was even supportive of them in such interactions.

71.     This was illustrated by the incidents in which Tomlinson threw his support behind Apuzzo as he needed to adjust performances as he got older, while the Company prohibited Ms. Bugge from making even slight changes to her performances due to her pregnancy.

72.     Regarding PTDC's compliance with the laws regarding providing a private space to pump breast milk, Tomlinson offered the following noncommittal, unhelpful and purposely ambiguous statement in his December 3, 2021 email, intended to thwart an employee, Ms. Delo, who was trying to clarify, establish and protect her rights as a breastfeeding mother under the law:

> There was no discussion from me, and we have no rule/policy regarding the expression of breast milk. I have no concerns about it, our company has no policy applicable to it, and our company is fine with your actions and New York State's laws . . . that govern the matter.
>
> I am running all of this by my human resources attorney to make sure there are no issues in our actions, and I will let you know if anything needs to be reconsidered.

73.     Despite Ms. Delo's protected complaints and objections to the Company's lack of policy or measures to comply with its legal obligations, Tomlinson thought it was sufficient for PTDC to have "no rule/policy regarding the expression of breast milk."

74.     This did not comply with the federal or New York law, and was not the effective dodge Tomlinson seemingly imagined it to be.  Violations of the laws requiring a private space to express milk are so common in the theatre industry that producers (mostly men) do not take them seriously (along with many other labor laws), and this is commonly observed in the theatre and performing arts industry.

75.     Tomlinson's statement shows that he, too, was secure in the Company noncompliance, and does not take the law seriously and apparently feels that it does not apply to him or PTDC.  Dashing off a dismissive email message that does not or barely pays lip service to the law is not enough, particularly when the employee who raised the objection and issue is then retaliatorily fired for objecting to violations of the legal rights of herself and others.

## V.     TOMLINSON BEGINS A CAMPAIGN OF INTIMIDATION AND RETALIATORY HARASSMENT AGAINST MS. DELO AND INTRODUCES A NEW POLICY AIMED AT PUNISHING MS. DELO AND MS. BUGGE

76.     After Ms. Delo made her protected complaints, she never again had a full conversation with Tomlinson.  He gave her the silent treatment from December 2021 straight through to June 2022, and in June he said perhaps a few words to her (conveying some instructions).  Everyone at PTDC could see that he harbored massive animus against her.  And at least to Marine and Ms. Delo, if not to Tomlinson's acolytes as well, it was obvious that he felt this way because of her pregnancy, motherhood, and related complaints.

77.     Just a few days after Ms. Delo sent her protected complaint email on December 3, 2021, Tomlinson intimidated and retaliated against Ms. Delo in a shocking and disgusting way. Knowing full well that she did not pump in a private room (having himself admitted that PTDC did not provide one), Tomlinson barged into her office with two male repairmen while Ms. Delo was pumping breast milk at her desk, without knocking on the sliding door.

78.     As he entered, Ms. Delo was the first person he could see, as she sat directly across from the sliding door.  Mr. Chambers, Ms. Delo's husband, was sitting at his desk and witnessed these events as well.  Apparently, Mr. Tomlinson and the repairmen were coming in to fix the office's air handling system.  Even though Ms. Delo had conveyed just the day before her concern that she was worried such a situation could happen due to the lack of any private space for her, Tomlinson gave her no warning that he would be or asked if it was a good time to be coming into her office.

79.     Once he entered, Tomlinson could plainly and instantly see that Ms. Delo was pumping at her desk.  Yet, amazingly and despicably, he did not apologize, offer an "excuse me" or "sorry," or offer to come back later.  Instead, he and the workmen just went about making the repairs.  Obviously, this was deeply uncomfortable, physically close, and appeared intended to embarrass and unsettle her, and intrude upon her space.

80.     Adding insult to injury, Tomlinson walked up to Ms. Delo's desk, and moved to use her phone.  He did this although there were at least two other open desks in the office with a connected and working phone that he could have used, rather than the one directly in front of Ms. Delo (with her seated at the desk using her breast pump).

81.     With the repairmen still present, Tomlinson reached across Ms. Delo's body (from the left to the right side) while she was still expressing milk, picked up her phone, then reached over her again with his other hand to dial a number, and began speaking to someone on the other end, all while hovering closely over Ms. Delo.

82.     Ms. Delo was so shocked by this in the moment that she cannot fully recall what he said on the phone, though she believes he was calling Noah Aberlin, a PTDC administrator who worked in the same building, to talk about the repair.

83.     It is obvious that he could have called this person by using one of the other spare, functioning phones in the room, or could have used his cell phone, or just walked down the hall, or waited a few minutes so that Ms. Delo could finish pumping.

84.     Tomlinson's conduct unmistakably displayed his hostility towards and disregard for Ms. Delo and her right to privacy while pumping.  Tomlinson's outrageous lack of consideration appears clearly intended to demonstrate her powerlessness and his control over what happens at PTDC, to punish her as a mother and a woman, and retaliate against her for her recent complaints.  He would later confirm his intent when rolling out PTDC's new discriminatory policies in April 2022.

85.     The period before the 2021 holiday season was taken up with in-studio rehearsals and tech work, and further rehearsals in January.  In late January 2022, the PTDC company traveled to Harrisburg and Pittsburgh, Pennsylvania for performances, with another trip to Minneapolis, Minnesota in mid-February 2022.

86.     Because Tomlinson had not yet outright banned her from traveling with her child, but had only said there had "not yet" been a problem at their meeting in December 2021, Ms. Delo brought Olive on these trips and tried not to draw attention to her presence.  For the trip to Pennsylvania, she drove a van along with her husband and Olive, transporting the costumes and other production equipment.  During all of these trips, Tomlinson refused to speak with her, and remained visibly angry at Ms. Delo for bringing Olive on tour, even though she had not caused any problems for PTDC or its operations.  This continued through performances in February and PTDC's travel to Florida for a tour in March 2022.

87.     By April 2022, Ms. Bugge was scheduled to return from her maternity leave, which Tomlinson discriminatorily viewed as a threat to PTDC's operations.  Even though PTDC

had never in the past maintained such a policy—even when a man, Ted Thomas, was disruptively and unprofessionally letting his children run around backstage at performances—Tomlinson (who in January celebrated 30 years at PTDC) now saw it as necessary because two women at PTDC had children.

88.     With Ms. Bugge scheduled to return on Monday, April 18, 2022 (the first workday after a week off for Easter), on Friday, April 8, PTDC rolled out a new anti-mother and anti-child policy to all employees.  The policy was distributed to employees in the form of a memorandum, and outlined a new "Workplace Policy" clearly aimed at her and Ms. Bugge and calculated to make their work lives unpleasant (and no doubt to discourage others from having children or bringing them to the workplace).

89.     This policy's pointed rhetoric is particularly surprising and eyebrow-raising because it is an internal HR memorandum.  The policy states that PTDC defines its "work premises" as "our rehearsal studios, the offices, the theaters where PTDC performs, or any external workspaces where we engage in off-site work, and the vehicles or transportation methods that PTDF provides or hires to bring its employees to and from off-site work locations."

90.     The policy document continued with a condescending and imperious justification for the ban on children at Paul Taylor.

> PTDF employees are required to maintain a professional demeanor within the workplace and work environments. A professional demeanor includes being able to work on all required tasks at the workspace in a safe and undistracted manner. In order to maintain a workplace that allows for such safe and professional conditions PTDF requires . . .

91.     This paraphrases Tomlinson's viewpoint on Ms. Delo's and Ms. Bugge's motherhood.  He viewed them as incapable of "maintain[ing] a professional demeanor."  He believed they were unable to "work on all required tasks" and that they therefore were unsafe

distractions for PTDC, simply because they might bring children to the workplace or sometimes had other priorities connected to their families.  He held this view even though neither woman had disrupted PTDC's operations.

92.     The only "unprofessionalism" or "distraction" a child had ever caused was years in the past under the watch of a male dancer who went completely unpunished and who was never disciplined or made the subject of a policy of this kind.  Warnings against a lack of professionalism also are particularly suspect from a manager who barged into a female employee's office while she was pumping breast milk and had the nerve to invade her physical space even after he could see what she was doing at the time.

93.     The policy's requirements included that employees would be limited to "brief and very occasional visits from friends or family," and then only in "clearly defined public areas of the workspace," as though Ms. Delo or Ms. Bugge and their children could somehow infect the rest of the workplace.

94.     The policy also states that absolutely no family could ever be present in Company-provided travel vehicles.  While the policies allow family to stay in hotels, recognizing (as they apparently realized they had to) that a hotel in off-hours is not company time, banning family from Company vehicles would make it impossible, practically speaking, for either Ms. Delo or Ms. Bugge to bring their children on Company trips.

95.     The Company also required that the individual wishing to travel with family "[i]nform PTDF if anyone other than the employee is going to reside in the out-of-town housing with the employee."  This is a gratuitous requirement, meant only to discourage employees from having family along, and would ensure that Ms. Delo and Ms. Bugge had to submit to unpleasant

invasions of privacy by Tomlinson, who was obviously hostile to them, if they wished to bring their children to stay with them at a hotel.

96.    It seems doubtful that PTDC intends to enforce this policy against men who might bring dates or friends back to their hotel rooms.  Only discovery will show whether PTDC has ever once enforced this rule since it was implemented, or whether it was meant to be a warning shot for Ms. Delo and Ms. Bugge or even an effort to drive them out of the Company.

97.    As a further ratcheting-up of pressure on and hostility towards Ms. Delo and Ms. Bugge, PTDC at the same time also introduced a "Drug Free Workplace" policy.  PTDC had not had notable problems with drug use in the past.  The policy, however, had quite a different purpose.  It was meant to signal to Ms. Delo and Ms. Bugge, again, that PTDC would give them no privacy or respect (emphasis added):

> In order to achieve the goals of this policy and maintain a safe, healthy, and productive work environment, the Paul Taylor Dance Foundation reserves the right at all times to inspect employees, as well as their surroundings and possessions, for substances or materials in violation of this policy. This right extends to the search or inspection of clothing, desks, lockers, bags, briefcases, containers, packages, boxes, tools and tool boxes, lunch boxes, and employer-owned or leased vehicles and any vehicles on company property where prohibited items may be concealed. **Employees should have no expectation of privacy** while on the Paul Taylor Dance Foundation's premises.

98.    A drug policy is one thing, but an unfettered inspection policy is quite another. The real purpose of the policy is found in its last sentence: "Employees should have no expectation of privacy while on the Paul Taylor Dance Foundation's premises."  Even after Ms. Delo's complaint about the lack of a private space to pump at PTDC, the Company still neglected to put in place a policy regarding, or take the basic step of designating a space that could be used for, the expression of breast milk, as required by law.  Instead, PTDC issued a

policy that did not address any ongoing issue at the Company, except to remind Ms. Delo and Ms. Bugge that they should not expect any respect for their privacy at PTDC.

99.     As further proof of bad faith in implementing the policy, the policy at first specified that, "[f]or insurance and safety reasons, unsupervised minors are not permitted to be in the workspace. Supervision of any minors at the workspace must be the responsibility of an adult other than a working PTDF employee."

100.    At some point, someone at the Company must have realized that this provision made no sense, because PTDC operated a dance school for children on its premises.  PTDC therefore revised this policy ten days after it was issued to create an exception for the dance school.  The change makes it extremely unlikely that there was any bona fide "insurance" or "safety" reason to exclude children from the PTDC premises in the first place, and further reveals that Tomlinson was simply casting about for a thin, catchall justification for the ban on kids at work.

101.    Tomlinson and PTDC will of course claim they did not realize how the policy would impact Ms. Delo and Ms. Bugge, and that the policy was facially neutral.  However, the circumstances speak for themselves.

102.    The policy memorandum was rolled out on the last business day before Ms. Bugge returned from her maternity leave.  In addition, the new policy completely ignored Ms. Delo's complaint, which had pointed out a legal violation by PTDC and its noncompliance with workplace laws—a real problem in need of a solution (unlike Tomlinson's crusade against employees bringing children to work).

103.    The reaction of PTDC employees who read the policy is telling.  Laura Halzack, a dancer who became PTDC Social Media Manager, whom Tomlinson had once forced to tell Paul

Taylor that she would never have a child, quit in disgust because of the policy (though this is not the reason she gave PTDC). She was heartbroken to see PTDC continuing its longstanding practice of open discrimination against and disrespect for women.

104. Sadly, as a result of the stress caused by PTDC's discrimination, retaliation and harassment, Ms. Delo has suffered the precise physical problem that the New York Labor Law and FLSA were meant to prevent. On several occasions, because of the stress caused by PTDC's actions, she failed to pump enough milk for her child, forcing her to obtain donor milk. Tomlinson no doubt sees these legal requirements as a mere nuisance and imposition, and could not care less about the emotional and physical distress he has caused by failing to follow the law.

## VI.   STACEY-JO MARINE FACES RETALIATORY HARASSMENT AFTER COMPLAINING ABOUT GENDER DISCRIMINATION

105. Marine, for her part, was dismayed by the new policy. She understood that Tomlinson intended it cruelly, to make life difficult for Ms. Delo and Ms. Bugge as mothers.

106. She was heartbroken by his conduct, having worked with him for many decades, and had hoped that he would accept Ms. Delo and Ms. Bugge as part of the Paul Taylor family even though they had children.

107. In the spring of 2022, Marine also witnessed at least two other incidents—in addition to the policy rollout—indicating discrimination at PTDC. First, as mentioned above, during a donor event, one donor, Hal Rubenstein, said to a group of dancers, with several PTDC administrators standing nearby, that he was pleased to see that they were a "fuckable" group that year, unlike in some past years. This did not seem to raise any concerns with other PTDC administrators nearby. To the contrary, they appeared to be quite pleased to hear Rubenstein's appraisal of their dancers.

108.     Then, alarmingly, around the same time, Richard Chen See, the Head of Licensing and Tomlinson's husband, accosted and intimidated Marine.  Chen See and Marine have known each other a very long time.  Chen See had been a dancer at PTDC in the 1990s, and they were well-acquainted "war buddies" who had been through many tours and performances together.

109.     After a period when Chen See had been out attending to an unfortunate illness in his family, Marine unexpectedly saw Chen See back in the office one day and remarked that she was "surprised" to see him.  She meant that, given how busy he had been, she was surprised to see him back.

110.     Chen See said nothing, but then, as she walked down the hallway, he chased her down, cornered her and began screaming at her, accusing her of "picking a fight" with him and telling her repeatedly that "she did not understand" his life.  Like many women put in a threatening position by a stronger man, Marine could only try to calm Chen See down.  Eventually, he ran away from her again and disappeared down the hallway, still screaming about what had happened.

111.     This incident finally caused her to complain to the Company directly via email that Chen See had made her feel unsafe and threatened, that Rubenstein's comments to the dancers were unacceptable, and that Rubenstein should not be allowed around them again.

112.     In response, PTDC shared her allegations with Chen See, and tried to insist that the two enter a mediation process.  Marine could not fathom why the Company would see mediation as the solution.  She had known Chen See for a long time and understood that he was under significant pressure.

113.    All Marine wanted from Chen See was an apology, while a mediation seemed designed to force her into some kind of compromise (or further confrontation) that the circumstances did not call for.  As to Rubenstein, the solution was simple—PTDC needed to ban him from further contact with the dancers.

114.    As further described by Marine, Tomlinson, Chen See's husband, told Marine that Chen See was an artist who could not help but have violent screaming outbursts at the women around him.  Because Chen See was an artist, Tomlinson expected Marine to forgive him. Similar sentiments may have been used to excuse the reported misconduct and abusive behavior of various other figures in the performing arts industry who have been subject to public scrutiny and/or legal claims recently, such as Peter Martin of New York City Ballet.

115.    Chen See, for his part, submitted in response to Marine's complaint a nine-page document describing twenty-five years of his grudges and anger against her.  By comparison, Marine's complaint (which involved sexual harassment and a physical threat) had been about three paragraphs long and related to conduct that had just occurred.

116.    As related by Marine, Chen See's document brimmed with lies and further intimidation, including a completely fabricated claim that Marine had touched him unwantedly when he was screaming at her in the hallway.

117.    Finally, by way of responding insincerely and sarcastically to the HR process, and even though nobody had asked him to do anything of the sort, Chen See began sending Marine alarming emails documenting when he entered and exited the building so that she could be sure to avoid him.  He eventually stopped, most likely having been informed by the person cc'd on these emails that he was behaving in a threatening and highly disturbing manner towards Marine.

118.    After decades of loyal service to PTDC, Marine felt broken by this treatment and by PTDC's apparent unwillingness to take any action, especially after PTDC rolled out it anti-maternity/anti-child policy in the weeks after her complaint.

119.    In May 2022, she put in her two-week notice, offering to train her replacement if needed, still putting PTDC's needs above her own.  Instead of taking this in the spirit in which it was offered, Tomlinson first agreed that Marine could work two more weeks, but then, as soon as she left the building, told her that he had deactivated her key and that she should not return.

120.    He treated her in this brusque manner because she was a woman and because she had complained about discrimination, and despite 30 years of loyal service.  For instance, when Ms. Delo's husband, Chris Chambers, had resigned early in 2022, he had been allowed to work through his final two weeks without any issue.  The treatment of Marine by Tomlinson and PTDC is further evidence of the hostile environment under which women work at the Company and the animus of management against the women who work there, as well as their practice of retaliating against those who complain about discrimination and misconduct.

**VII.   PAUL TAYLOR UNLAWFULLY TERMINATES MS. DELO**

121.    Even amid this hostile work environment, and despite her sadness at losing Marine, Ms. Delo continued her work through some sporadic trips for performances and in-studio rehearsals through May and June, leading up to the Company's climactic appearance at the Joyce Theatre in mid-June 2022.  Ms. Delo routinely worked well over her 40 scheduled hours, demonstrating a complete commitment to PTDC.

122.    At the Joyce's closing night party, PTDC also celebrated Pride Month.  As ever, Tomlinson continued to refuse to speak with Ms. Delo, who came to the party with her daughter Olive.  Indeed, at times, she could see that he was visibly glowering at her.

123.    At one point, one of the PTDC administrators, who is himself gay, took the stage
to make a speech in honor of Pride.  At an emphatic moment in the speech that was followed by
a brief silence, Olive let out a little yelp that, in the moment, sounded like a yelp of agreement.
This was hugely amusing to everyone and elicited laughter and shouts, with the speaker himself
responding joyfully.  It was a positive and memorable moment.  But Tomlinson remained
completely silent, and Ms. Delo could see that he had turned bright red.

124.    As dancers and other PTDC employees made the rounds to say "hi" to Ms. Delo
and her child, Tomlinson continued to avoid her.

125.    At this point, only two major events remained in PTDC's season: a show in
Chatham, New York on July 6th and 7th, followed by a photoshoot on July 22, 2022.  As always,
Ms. Delo performed her work to a "T."  Indeed, Artistic Director, Michael Novak, thanked her in
front of the entire staff for her good work after the July 22nd photoshoot.

126.    After the photoshoot, there would be no scheduled events for the company of
dancers until September 10, 2022, apart from rehearsals, and even the September 10 event would
be relatively small.

127.    Knowing he could now safely do so without disrupting PTDC's season,
Tomlinson fired Ms. Delo on July 26, 2022, effective immediately, just as Ms. Marine's
termination had been "effective immediately" and Mr. Chambers' had not.  It is obvious
Tomlinson had it in mind to fire Ms. Delo for some time due to his simmering discriminatory
and retaliatory animus against her.

128.    From the start, Tomlinson had viewed Ms. Delo as a "liability" based on her
gender and motherhood, and took an especially harsh and hostile turn against her when she
complained about discrimination and violations of the New York Labor Law and FLSA.  From

December 2021 until April 2022, he had nursed a retaliatory grudge against Ms. Delo, as

evidenced by the policy he rolled out targeting her and Ms. Bugge.  Still, having seen how much

disruption and annoyance PTDC had faced when they lost their last Wardrobe Supervisor,

Tomlinson knew he could not fire her until the season was well over and there was a long lull

between performances.

129.    When Ms. Delo, shocked, asked why Tomlinson was terminating her, he first

responded by crowing that she was an at-will employee, and that he did not need any reason to

fire her.  When Ms. Delo pressed him further—fully confident in her abilities, and having just a

few days earlier received praise from Novak—Tomlinson unconvincingly insisted that the whole

"organization" just felt she was "not the right fit."  When she left his office, she sought out

Novak to see if she could get a better explanation.  He had none.

130.    Instead, he told her simply, "This is the decision we made."  It is obvious from

these meaningless, evasive responses that PTDC had no legitimate business reason for

terminating Ms. Delo.

131.    Shortly after she was terminated, Ms. Delo received a text from one of PTDC's

dancers, demonstrating how common and expected retaliation has become at PTDC.  In it, the

dancer told Ms. Delo:

> This is so fucked up. I literally have no words to describe my anger.
> I wish the dancers/myself felt secure enough to voice our concerns
> and feelings about certain situations and terminations but the truth is
> we all feel very scared and that we could be next to be fired.

132.    PTDC faces significant exposure to economic damages and penalties for its

conduct.  First, Ms. Delo has suffered a great deal of economic damage because of her

termination.  It is well known that creative performers and production workers in dance, and

theatre in general, always face a shortage of good jobs, particularly jobs that are full-time and offer employment and income on a continuous basis from one year to the next.

133.    This is the power imbalance in which the Company operates, and which some of its management exploits.  It is the power imbalance that makes it impossible for women like Ms. Bugge and Ms. Halzack to leave a dance company that treats them like second-class citizens for having or wanting to have a child.  For both herself and other women like her former colleagues at Paul Taylor who have had to suffer these indignities and mistreatment in order to do the work and make the art they love, Ms. Delo has filed this case.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of the FLSA)
#### *Against All Defendants*

134.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as though set forth fully herein.

135.    Section 15(a)(3) of the FLSA provides that an employer shall not "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

136.    By the conduct described above, in response to Plaintiff's protected complaints and/or reports, Defendants subjected Plaintiff to a hostile work environment, intimidation, harassment, discrimination and other retaliation, including but not limited to termination.

137.    As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be

determined at trial, together with an award of punitive and liquidated damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

### SECOND CAUSE OF ACTION
### (Unlawful Retaliation Under New York Labor Law § 740, *et seq.*)
### *Against All Defendants*

138.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 12-133 as if set forth fully herein.

139.    New York Labor Law § 740 provides that "[a]n employer shall not take any retaliatory action against an employee . . . because such employee . . . discloses, or threatens to disclose . . . an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety . . . or [] objects to, or refuses to participate in any such activity, policy or practice."

140.    By the conduct described above, in response to Plaintiff's protected complaints and/or reports, Defendants subjected Plaintiff to a hostile work environment, intimidation, harassment, discrimination and other retaliation, including but not limited to termination.

141.    Mr. Tomlinson actively participated in and/or aided and abetted the unlawful conduct described herein.

142.    As a result of Defendants' conduct, Plaintiff has suffered economic and non-economic injury for which she is entitled to monetary and other damages in an amount to be determined at trial, together with an award of punitive and liquidated damages in an amount to be determined at trial, and any and all other available relief including attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**(Gender and Familial Status Discrimination under the NYSHRL)**
*Against All Defendants*

143.     Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 12-133 as though set forth fully herein.

144.     Plaintiff has discriminated against Plaintiff on the basis of her gender and familial status in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her gender and familial status, including, but not limited to, discriminatorily failing to hire her, discriminatorily subjecting her to unequal and inequitable terms of employment, and discharging her.

145.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

146.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

147.     Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**
*Against All Defendants*

148.     Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 12-133 as though set forth fully herein.

149.    Defendants have retaliated against Plaintiff on the basis of her protected activity in violation of the NYSHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia*, subjecting Plaintiff to a hostile work environment and terminating her.

150.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

151.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

152.    Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
### (Gender and Caregiver Discrimination under the NYCHRL)
### *Against All Defendants*

153.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 12-133 as though set forth fully herein.

154.    Defendants have discriminated against Plaintiff on the basis of her gender and caregiver status in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender and caregiver status, including, but not limited to, subjecting her a hostile work environment, discriminatorily failing to hire her, discriminatorily subjecting her to unequal and inequitable terms and conditions of employment, and discharging her.

155.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

156.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

157.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
***Against All Defendants***

158.    Plaintiff hereby repeats and re-alleges each and every allegation in paragraphs 12-133 as though set forth fully herein.

159.    Defendants have retaliated against Plaintiff on the basis of her protected activity in violation of the NYCHRL by subjecting Plaintiff to adverse actions because she engaged in protected activity, including, *inter alia*, by terminating her.

160.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

161.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

162.    Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.    An injunction and order permanently restraining Defendants and its officers, officials, agents, successors, employees and/or representatives, and any and all persons acting in concert with and/or on behalf of them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.    An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, as well as damage to his reputation, under applicable law;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial;

F.      An award of punitive damages and any other applicable damages or penalties (including liquidated damages) in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of fees and costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  November 3, 2022
        New York, New York                                  Respectfully submitted,

                                                            **WIGDOR LLP**


                                                            By: _____
                                                                Lawrence M. Pearson
                                                                John S. Crain

                                                            85 Fifth Avenue
                                                            New York, NY 10003
                                                            Telephone: (212) 257-6800
                                                            Facsimile: (212) 257-6845
                                                            lpearson@wigdorlaw.com
                                                            jcrain@wigdorlaw.com

                                                            *Counsel for Plaintiff*